**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Laurie Ortolano

     v.                          Civil No. 22-cv-326-LM
                                     Opinion No. 2026 DNH 045 P

Steven Bolton and
Celia Leonard

### O R D E R

Plaintiff Laurie Ortolano filed this lawsuit against defendants Steven Bolton and Celia Leonard who are, respectively, Corporation Counsel and Deputy Corporation Counsel for the City of Nashua ("Nashua" or "the City"). Ortolano alleged that Attorneys Bolton and Leonard subjected her to a retaliatory arrest after she trespassed at the Legal Department of Nashua City Hall in January of 2021. After five days of trial, a jury returned a verdict in favor of the defense. Ortolano now moves for a new trial with respect to each defendant under Federal Rule of Civil Procedure 59. Doc. nos. 244 & 245. Bolton and Leonard object. Doc. nos. 250 & 251. For the following reasons, Ortolano's motions (doc. nos. 244 & 245) are denied.

### STANDARD OF REVIEW

A district court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The court may grant a new trial under Rule 59 "on the basis that the verdict is against the weight of the evidence." Jennings v. Jones, 587 F.3d 430, 436

EXHIBIT 1

(1st Cir. 2009). In addition, "the district court has the power and duty to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." Id. (quoting Kearns v. Keystone Shipping Co., 863 F.2d 177, 181 (1st Cir. 1988)). Although a trial court faced with a Rule 59 motion for a new trial "is free to independently weigh the evidence," a "'district judge cannot displace a jury's verdict merely because [she] disagrees with it' or because 'a contrary verdict may have been equally supportable.'" Id. (brackets omitted) (quoting Ahern v. Scholz, 85 F.3d 774, 780 (1st Cir. 1996)). "[T]rial judges do not sit as thirteenth jurors, empowered to reject any verdict with which they disagree." Id.

## BACKGROUND[1]

As of January 2021, Ortolano had submitted over 100 written and verbal "Right-to-Know" requests with the City of Nashua, see RSA ch. 91-A, primarily seeking to obtain documents pertaining to the City's Assessing Department and its policies and processes for assessing property taxes. Ortolano had also filed at least one lawsuit against the City in New Hampshire state court alleging violations of the Right-to-Know law, as well as a property tax abatement appeal with the Board of Tax and Land Appeals. Attorney Leonard assisted the City in responding to Ortolano's Right-to-Know requests, and both attorneys represented the City in Ortolano's state-court action and her abatement appeal. In addition, as of January 2021, Ortolano had made public statements criticizing the City and its officials, including Attorneys Bolton and Leonard.

---

[1] The following facts are drawn from the evidence presented at trial.

**EXHIBIT 1**

Prior to January 2021, Ortolano had visited the Legal Department on at least three occasions. In 2019, Ortolano had requested to meet with Kim Kleiner, who oversaw the Assessing Department. Kleiner was reluctant to meet with Ortolano, and asked Attorney Bolton to join her. Attorney Bolton testified that Ortolano was dissatisfied with his answers to her questions at the meeting, and that he eventually had to ask her to leave when it became clear they "weren't going to be able to continue on in a civil manner." Doc. no. 243 at 107. Approximately one year later, Ortolano filed a complaint with the Attorney Discipline Office of the New Hampshire bar, alleging that Attorney Bolton had attempted to discuss matters with her upon which she was represented by counsel.[2]

In September 2019, Ortolano went to the Legal Department to ask a question about a meeting that previously took place in the Assessing Department among employees in that department. Attorney Leonard informed Ortolano that the Legal Department could not respond to general requests about meetings that took place in other departments and would instead only respond to Ortolano's document requests under the Right-to-Know law. Later that day, Ortolano sent Attorney Leonard an email acknowledging that Attorney Leonard made it "very clear" that the Legal Department would "only . . . address specific document requests" and could not assist her with other matters. Def. Ex. A.

In January 2020, Attorney Bolton was sitting in his office in the Legal Department when an assistant informed him that Ortolano had come to the office

---

[2] Attorney Bolton was later exonerated of Ortolano's allegations.

**EXHIBIT 1**

and wished to speak with him. Attorney Bolton exited his office and saw Ortolano bending over another assistant's desk, going through confidential files and paperwork. Attorney Bolton told Ortolano that she could not look through the Legal Department's files and that, going forward, she would be required to seek an appointment before being permitted entry to the Legal Department. Shortly thereafter, the Legal Department began locking its entry door and put up a sign informing the public that visits would be permitted by appointment only.

Ortolano also had encounters with City employees from other departments prior to January 2021. In 2018, the City reappraised Ortolano's property. The appraiser who evaluated Ortolano's property was named Greg Turgiss. Ortolano was dissatisfied with Turgiss's appraisal. In March 2019, Ortolano hired a private investigator to follow Turgiss during the workday while he drove around the City inspecting properties.[3] Ortolano assisted the private investigator in tracking Turgiss: she provided him with the license plate number and make and model of Turgiss's car; shared Turgiss's general work habits; and, on at least one occasion, waited in the public area of the Assessing Department and messaged the investigator when Turgiss left. In April 2019, the investigator produced a report, which Ortolano then provided to the City. She also asked the Nashua Police Department to open a criminal investigation into Turgiss, which they did.

---

[3] Ortolano testified that her dissatisfaction with Turgiss's appraisal was not what led her to commission the private investigator.

**EXHIBIT 1**

At the same time the police were conducting their investigation, Ortolano was emailing Kleiner asking to meet with particular members of the Assessing Department,[4] and would also come to the Assessing Department seeking to question assessors regarding their job duties. When Attorney Leonard denied Ortolano's request to meet with a particular employee of the Assessing Department, Ortolano called and attempted to set up a meeting with him anyway. One Assessing Department employee claimed that Ortolano waited outside the Assessing Department and approached her on her lunch break. Members of the Legal Department were aware of the private investigation Ortolano commissioned, the criminal investigation she initiated into an Assessing Department employee, and her attempts to question other members of the Assessing Department while that criminal investigation was ongoing.

As of January 2021, Ortolano was assisting two Nashua residents with property tax abatement applications. At the same time, Ortolano was represented by counsel in ongoing litigation against the City as well as one of Ortolano's own abatement actions. On January 17, 2021 (a Sunday), Ortolano submitted two abatement applications to Chief Assessor Richard Vincent, and asked that the cover pages of the applications be date stamped and emailed back as proof of receipt. On January 20, Ortolano followed up with Vincent, notifying him that she had not yet received the requested date stamps. Vincent responded that same day, confirming that he would look into why she had not yet received the date-stamped cover letters.

---

[4] Ortolano also asked the Police to open a criminal investigation into Kleiner.

**EXHIBIT 1**

Ortolano again followed up with Vincent via email after close of business on January 21, reiterating her concern that she had not yet received the date-stamped cover letters. She copied the Mayor of Nashua, the Board of Assessors, the Board of Aldermen, and members of the New Hampshire Department of Revenue Administration on this email. When Ortolano had not received a response by 9:00 a.m. the next morning, she went to City Hall.[5]

Ortolano testified that she went to City Hall with copies of the abatement applications she was hoping to have date stamped. When she arrived, she went to Administrative Services, but the lights were off.[6] She then went to the mayor's office on the second floor, but it was closed as well. Finally, Ortolano went to the third floor, where the Legal Department is located. As noted, there was a sign outside the Legal Department that said visits were permitted by appointment only, and the entrance door was locked. Ortolano knocked on the door, and an assistant named Mindy Lloyd answered, opening the door partway.[7] Ortolano asked to meet

---

[5] Vincent emailed Ortolano at 12:49 p.m. on January 22, notifying her that the Assessing Department had processed and logged all abatement applications in its possession, and that the Department had emailed copies of any requested date-stamped applications directly to the property owner. He later told Ortolano that she had not been provided with the date-stamped applications because Ortolano had not signed the portion of the applications indicating that she was representing the property owners.

[6] Nashua City Hall was under COVID-related restrictions on in-person work during this time.

[7] Lloyd was present for Ortolano's 2019 meeting at the Legal Department with Kleiner and Attorney Bolton. She testified that she recalled Ortolano raising her voice at that meeting. Lloyd was also present for the 2020 incident in which Attorney

**EXHIBIT 1**

with Attorney Jesse Neumann, who had begun working for the Legal Department the month prior and who was being tasked with responding to Right-to-Know requests. Lloyd asked Ortolano if she had an appointment, and Ortolano said she did not. Lloyd told Ortolano that Attorney Neumann was not available and that she could not come in without an appointment. Ortolano told Lloyd she was coming in anyway. Ortolano then pulled the door open and away from Lloyd's hand. Lloyd had to move out of the way to avoid being bumped by Ortolano as she entered the Legal Department.

As Ortolano made her way to the area of the Legal Department where the assistants' desks were located,[8] Lloyd continued to tell Ortolano that she was not permitted to be in the Legal Department and that she needed to leave. Attorney Neumann, who had been at his desk in the conference room, also got up and told Ortolano that she was trespassing and needed to leave. Ortolano refused to leave. According to Attorney Neumann, Ortolano continued to talk about abatement date stamps while also berating him and Lloyd.[9] Ortolano said she would not leave until someone assisted her, and then she sat down on the floor of the Legal Department outside of Attorney Leonard's office.

---

Bolton observed Ortolano going through confidential files on another assistant's desk and instructed her to leave.

[8] Lloyd testified that there were confidential documents on the legal assistants' desks.

[9] Lloyd testified that Ortolano never told her she was there to obtain date stamps on abatement applications. Attorney Leonard also testified that Ortolano never told her she was there to have paperwork stamped.

**EXHIBIT 1**

Lloyd called the Risk Management Department at City Hall, who instructed her to call the police. Around the same time, Attorney Leonard arrived at the office. Attorney Leonard also told Ortolano that she needed to leave and that Ortolano's behavior was hostile and threatening. Ortolano replied with words to the effect of, "Oh you poor baby," and said she would not leave unless the police made her leave. Ortolano then got up and sat down next to the main entrance to the Legal Department where she had come in.

Attorney Leonard testified that there were "a lot of reasons" she wanted Ortolano to leave:

> First and foremost, my colleagues had already expressed that they wanted her out of there, and my job is to support the office. Second, I knew she had no appointment to be there that day. There was no legitimate purpose for her to be there that day in our locked area. And the behavior of sitting on the floor was a departure from the few times she had been in there before, you know, either to drop something off, as she had testified, or there had been a meeting; even if it got heated with Attorney Bolton. When the time came to leave or she was asked to leave, she left. And this time, I knew that she had been asked to leave, and she hadn't. And beyond that, she was physically blocking the entrance to my office and it just – it needed to end. She needed to leave. We needed to get back to the business of what we were there to do.

Doc. no. 243 at 23-24.

Shortly after Lloyd called the police, Officer Timothy Roach of the Nashua Police Department arrived at the Legal Department. Officer Roach spoke with Ortolano and Attorney Leonard. Ortolano told Officer Roach that she was trying to obtain date stamps for abatement paperwork but the City had refused to respond to

**EXHIBIT 1**

her communications. She told Officer Roach that this upset her and caused her to go to the Legal Department that morning.

In speaking with Attorney Leonard, Officer Roach asked her if she wanted Ortolano "trespassed." Attorney Leonard testified that she thought Ortolano being trespassed would result in an order not to return to the Legal Department without an appointment for a specified period of time, as well as other "natural consequences" such as a criminal investigation and an arrest, "if warranted." Id. at 26-27. Attorney Leonard confirmed with Officer Roach that she wanted Ortolano trespassed. She did not explicitly state that she wanted Ortolano arrested, prosecuted, or for the police to open a criminal investigation.

Officers then informed Ortolano she was being trespassed from City Hall and could not return for a year unless she had an appointment. They also told her that she faced arrest if she returned within that time without an appointment. Ortolano expressed frustration "and also commented that she would probably be arrested as she would be back." Pl. Ex. 47 at 5. Officers then asked Ortolano to leave, and she did so.

Although officers told Ortolano on January 22 that she would be trespassed from City Hall, a Sergeant with the Nashua Police Department later informed a reporter that Ortolano was not being charged with a crime on the basis of her actions on January 22. This same reporter also spoke with Attorney Leonard. When the reporter informed Attorney Leonard of the Sergeant's statement that Ortolano would not be criminally charged, Attorney Leonard responded that she found this

**EXHIBIT 1**

"troublesome, to say the least," and that her "office will be speaking with police further." Pl. Ex. 51 at 3.

Attorney Bolton was not present at the Legal Department during the incident on January 22.[10] When he learned from his staff what transpired, he contacted Michael Carignan, who was then the Chief of Police for the Nashua Police Department. Attorney Bolton asked to meet with Chief Carignan, and the Chief agreed. At the meeting, Attorney Bolton expressed that all of the witnesses ought to be interviewed before making any decisions on what further action, if any, should be taken.[11] Chief Carignan told Attorney Bolton that the police considered the matter closed and would not be taking any further action.[12] However, a few days later, Chief Carignan contacted Attorney Bolton and informed him that an officer would interview the participants and witnesses. According to Chief Carignan, his subordinates elected to open an investigation after becoming aware of a social media post Ortolano made that caused officers to become concerned Ortolano would trespass at the Legal Department again.

---

[10] Attorney Bolton suffered a stroke in December 2020 and was hospitalized for three weeks. He testified that he could not recall the precise reason he was absent from the Legal Department the morning of January 22, but thought he probably had a follow-up medical appointment or physical or occupational therapy.

[11] Chief Carignan testified at trial that Attorney Bolton demanded Ortolano's arrest. He also testified that the Nashua Police Department generally does not arrest people for criminal trespass if they leave after being asked to do so by the police.

[12] Although Attorney Leonard attended this meeting as well, along with other high-ranking officials at the Police Department, Attorney Bolton and Chief Carignan were the only ones that spoke.

Officer Roach was placed in charge of the investigation.[13] He went to City Hall on February 1, 2021, and spoke with a City Hall employee named Jasmine Castro. Castro was working as a greeter on the ground level of City Hall on January 22. She told Officer Roach that Ortolano said she was there to speak with Kleiner in "reference [to] obtaining stamps for abatement documentation she had."[14] Pl. Ex. 47 at 8. Officer Roach made appointments to interview Lloyd, Attorney Neumann, and Attorney Leonard on February 3. He also reviewed video footage.

After Officer Roach completed his investigation, he applied for an arrest warrant for criminal trespass. See RSA 635:2. Based on an affidavit submitted in support of the arrest warrant's issuance, a Justice of the New Hampshire Circuit Court found probable cause to believe that Ortolano committed misdemeanor criminal trespass and authorized the issuance of an arrest warrant. See RSA 635:2, I, III(b)(2). Ortolano turned herself in on that warrant, and she was charged with criminal trespass as a class A misdemeanor. See RSA 635:2, I, III(b)(2); RSA 625:9, IV(c)(2). Ortolano, who was represented by retained counsel in this criminal proceeding, entered into a negotiated agreement with the State pursuant to which

---

[13] Officer Roach's police report states that, on February 1, 2021, he was "made aware by supervisors that City Hall through Attorney Celia Leonard had contacted the Nashua Police Department and wished to open an investigation into the incident that occurred on January 22, 2021 involving Laurie Ortolano." Pl. Ex. 47 at 6. Attorney Leonard denied speaking with any members of the Nashua Police Department between January 22 and her interview with Officer Roach after the investigation was reopened, and neither party called the supervisor referenced in Officer Roach's report.

[14] Although Kleiner oversaw the Assessing Department, her physical office was located in Administrative Services.

11

**EXHIBIT 1**

the State agreed to reduce the charge to a violation-level offense in exchange for Ortolano's plea of guilty to that reduced offense. See RSA 625:9, II(b) ("A violation does not constitute a crime and conviction of a violation shall not give rise to any disability or legal disadvantage based on conviction of a criminal offense."). The parties agreed that Ortolano would be sentenced to a $500 fine, all but $100 of which would be suspended for a period of one year, conditioned on Ortolano's good behavior and not entering the Legal Department at City Hall without an appointment. The state court accepted Ortolano's guilty plea and adopted the parties' proposed sentence. Ortolano subsequently had her conviction annulled.

Ortolano later brought this action against Attorneys Bolton and Leonard for retaliatory arrest. As noted, after a five-day trial, a jury returned a verdict for the defense.

## DISCUSSION

Ortolano moves for a new trial on four grounds. She argues that: (1) the verdict is against the clear weight of the evidence; (2) the court's jury instructions on causation were prejudicially erroneous; (3) the exclusion of evidence of a July 2022 interaction between Ortolano and Attorney Bolton unfairly prejudiced her case; and (4) the court's failure to exclude evidence that Ortolano used a sex-based epithet in public testimony when referring to Attorney Leonard in the months after the arrest was unfairly prejudicial. The court will address each argument in turn.

**EXHIBIT 1**

I.        The Verdict Is Not Against the Clear Weight of the Evidence

While Rule 59 permits a court to set aside a verdict if it is against the weight of the evidence, "[s]o long as a reasonable basis for the verdict exists, it should not be disturbed." Román Martínez v. Delta Maint. Serv., Inc., 229 F. Supp. 2d 79, 91 (D.P.R. 2002). A verdict is against the clear weight of the evidence only when "upholding the verdict will result in a miscarriage of justice." Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 171 (1st Cir. 2005) (quoting Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 375 (1st Cir. 2004)).

There was a reasonable basis for the jury's verdict, and upholding it will not result in a miscarriage of justice. The jury heard evidence that Ortolano had engaged in behavior toward City Hall employees prior to January 2021 that could have caused a reasonable City Hall employee to be cautious in their interactions with Ortolano. Specifically, they heard evidence that Ortolano had: (1) attempted to view confidential files in the Legal Department; (2) commissioned a private investigation, and ultimately initiated a criminal investigation, into the assessor that evaluated her property; (3) waited outside the Assessing Department to approach an employee on their lunch break; (4) attempted to circumvent Attorney Leonard's denial of her request to speak with a particular Assessing Department employee; and (5) copied high-ranking City and state officials on emails to the Chief Assessor when he did not answer her questions in as expeditious a manner as she desired. The jury also heard testimony that, on January 22, 2021, Ortolano grabbed the entry door to the Legal Department from Lloyd's hands, and that Lloyd had to move out of the way to avoid being bumped as Ortolano entered the Legal

13

Department. Then, when Attorneys Neumann and Leonard repeatedly told Ortolano she was trespassing and needed to leave, Ortolano responded by calling Attorney Leonard a "poor baby" and stating she would not leave unless the police made her. And when Officer Roach told Ortolano on January 22 that she could not return to the Legal Department without an appointment, she responded that she would probably be arrested as she planned on returning.

Attorney Bolton credibly testified that he arranged to meet with Chief Carignan because the January 22 incident made him concerned for the safety of his staff. And Attorney Leonard similarly testified that she asked Officer Roach to trespass Ortolano because she found Ortolano's conduct on January 22 hostile, concerning, and an escalation from her prior behavior toward the Legal Department. Chief Carignan also offered credible testimony that he declined Attorney Bolton's request, and that the decision to open further investigations into the January 22 incident was made by his subordinates based on their concern that, absent an investigation, Ortolano would trespass at the Legal Department again. While the temporal proximity of only a few days between Attorney Bolton's request and the decision to reopen the investigation could have provided some basis for the jury to conclude that Attorney Bolton's request played a causal role in her ultimate arrest, there is a reasonable basis for the jury to have drawn the contrary conclusion. See doc. no. 232 at 10 (jury instructions on causation). Similarly, while there was some evidence that Attorney Leonard reached out to the Police Department requesting that an investigation be opened, Attorney Leonard denied

14

doing so, and the person whom she supposedly communicated with never testified. And, although Attorney Leonard attended the meeting between Attorney Bolton and Chief Carignan, it is undisputed that Attorney Leonard did not speak at this meeting. Thus, there was a reasonable basis grounded in competent evidence for the jury to have concluded that Attorney Leonard did not cause Ortolano's arrest. See id.

There was also a reasonable basis to conclude that the defendants' actions were not "motivated by an intent to retaliate against . . . Ortolano for engaging in constitutionally protected conduct." Id. at 11. Both attorneys credibly testified that they found Ortolano's behavior on January 22 concerning and that they were seeking to protect their staff. Attorney Bolton in particular offered powerful testimony (during cross-examination) regarding his state of mind:

> Q: Did you also indicate [to a reporter]: In this case, happily, no one was injured or worse.
> A: I may have said that. I was happy no one was hurt.
> Q: Well, what was the or worse? What were you thinking when you said or worse?
> A: Worse than being injured?
> Q: Yeah. What's worse than being injured?
> A: Death.
> Q: Okay.
> A: Would you like me to explain what was in my mind when I said that?
> Q: Go ahead.
> A: Some years ago up in Colebrook a man named Carl Drega waked into a lawyer's office. The lawyer's name was Vickie Bunnell. She happened to be the selectperson, assessor, in the neighboring town of Clarksville. Mr. Drega was unhappy with the tax assessment on his property, and he had a dispute with the town and its board of selectpersons over that. Mr. Drega walked into Attorney Bunnell's office, shot and killed her, and killed a person

15

> . . . in the neighboring office. These things do happen. I was
> very happy that nothing like that happened in my office.

Doc. no. 247 at 40-41. Especially given Ortolano's history of high-conflict interactions with City Hall employees discussed above, there was a reasonable basis for the jury to conclude that Attorneys Bolton and Leonard were not motivated by animus against Ortolano's records requests, lawsuits, or public criticism, but rather by a bona fide concern regarding the possibility that Ortolano's conduct would continue to escalate.

For these reasons, the verdict is not against the clear weight of the evidence.

II.     The Court's Jury Instructions on Causation Were Not Prejudicially Erroneous

Ortolano sued Attorneys Bolton and Leonard under 42 U.S.C. § 1983. Section 1983 restricts liability to persons whose conduct causes a violation of the plaintiff's federal rights. Hewes v. Pangburn, 162 F.4th 177, 190 (1st Cir. 2025). "The element of causation is 'similar to that of ordinary tort law.'" Id. (quoting Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 831 (1st Cir. 1987)). At trial, the court instructed the jury that, to hold a defendant liable to Ortolano, the jury had to find by a preponderance of the evidence that the defendant's conduct was both a factual cause and a proximate cause of Ortolano's arrest. See doc. no. 232 at 10;[15] see also Drumgold v. Callahan, 707 F.3d 28, 48-49 (1st Cir. 2013). The court explained that

---

[15] Instead of using the phrases "factual cause" and "proximate cause," which would have created the possibility of juror confusion, the court simply labeled them as separate components of causation, both of which needed to be present in order for a defendant to be liable. See doc. no. 232 at 10.

16

**EXHIBIT 1**

a defendant's conduct is a factual cause of a plaintiff's harm when, (1) but for the defendant's actions, the harm would not have occurred, or (2) when the harm was brought about by the defendant's actions and another person's unrelated actions, each of which would have been sufficient by itself to cause the harm. Doc. no. 232 at 10; see Drumgold, 707 F.3d at 48-49. The court also explained that a defendant's conduct is a proximate cause of a plaintiff's harm when the harm was a reasonably foreseeable consequence of the defendant's actions. Doc. no. 232 at 10; see Drumgold, 707 F.3d at 48.

During the trial, Ortolano submitted a proposed jury instruction on causation that would have instructed the jury that a defendant "causes an arrest if the defendant's actions set in motion events that the defendant knew or reasonably should have known would lead to the arrest." Doc. no. 230 at 2. Ortolano contends that the court committed prejudicial instructional error by failing to include her requested language. She submits that the prejudicial nature of the court's instructions is highlighted by a question from the jury during deliberations regarding causation.

As an initial matter, Ortolano fails to demonstrate that her challenge to the court's instruction on causation is preserved. Federal Rule of Civil Procedure 51 provides that the court must give the parties an opportunity to object to the court's proposed jury instructions "on the record and out of the jury's hearing before the instructions and arguments are delivered." Fed. R. Civ. P. 51(b)(2). An objection to a proposed instruction is timely if it is made "at the opportunity provided under Rule

17

51(b)(2)." Fed. R. Civ. P. 51(c)(2)(A). "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). The First Circuit strictly construes Rule 51: "[E]ven if the initial request is made in detail, the party who seeks but did not get the instruction must object again . . . before the jury retires for deliberations."[16] Gray v. Genlyte Grp., Inc., 289 F.3d 128, 134 (1st Cir. 2002) (emphases omitted).

The court held a charging conference the morning after Ortolano filed her proposed instruction on causation. See doc. no. 243 at 1-11. At the charging conference, Ortolano advocated for keeping the court's instruction on but-for causation, and stated she was "happy with the way the Court" divided factual cause and proximate cause. Doc. no. 243 at 5-6. The court held another charging conference on February 9, where it notified the parties that it was finalizing the jury instructions and therefore was providing the parties "a last opportunity to put anything on the record" regarding the court's instructions before it instructed the jury. Doc. no. 249 at 2. Ortolano stated she had no further objections. Thus, while Ortolano submitted proposed jury instructions with language regarding causation that she preferred, she did not object to the court's failure to include her preferred language prior to commencement of the jury's deliberations.

---

[16] This rule has come under criticism in recent years. See United States v. Serrano-Delgado, 29 F.4th 16, 25 (1st Cir. 2022) (highlighting critiques from Barron, J., Kayatta, J., and Lipez, J.). Nevertheless, this court "has no power to ignore it as circuit precedent." Id.

**EXHIBIT 1**

But even if Ortolano had preserved her objection, she fails to demonstrate that the court's instructions on causation were erroneous. In support of her requested language, Ortolano pointed to Sanchez v. Pereira-Castillo, 590 F.3d 31 (1st Cir. 2009), where the First Circuit explained that the causal connection required by § 1983 "can be established not only by some kind of personal participation in the deprivation [of the plaintiff's federal rights], but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Sanchez, 590 F.3d at 50 (brackets omitted) (quoting Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989)); see doc. no. 230 at 2 n.1. This court's instructions adequately conveyed that concept.

Specifically, the court explained to the jury that a defendant could be liable to Ortolano only if the jury found that, (1) but for the defendant's conduct, Ortolano would not have been arrested, and (2) that Ortolano's arrest was a reasonably foreseeable consequence of the defendant's conduct. The concept of but-for causation encompasses both active participation in the complained-of constitutional injury as well as setting in motion actions that result in the injury and which, but for the defendant's conduct, would not have transpired. See, e.g., Jarvis v. Vill. Gun Shop, Inc., 805 F.3d 1, 10 (1st Cir. 2015) (rejecting argument that private parties' conduct constitutes state action whenever a state actor is the but-for cause of the private conduct because it would mean that, "[a]ny time the state performs an action that sets in motion some subsequent action by a private party—say, issuing a driver's

license—the private party could be deemed to have acted jointly with the state").

"Although a trial court is required to convey the proper legal standards in its jury

instructions, its word choices as among acceptable formulations are largely

discretionary." United States v. Sabean, 885 F.3d 27, 45 (1st Cir. 2018). So long as

the court's instructions provide an "appropriate legal framework for jury

consideration of" the plaintiff's contention, a court does not "err in refusing to parrot

[the plaintiff's] preferred wording in its jury instructions." United States v.

Sampson, 486 F.3d 13, 38 (1st Cir. 2007).

Nor does the jury's question regarding causation demonstrate that the jury

struggled to understand the concept of but-for causation. During deliberations, the

jury submitted the following question:

> [F]or the second claim[17] are we looking at it trying to prove
> an illegal approach towards getting an arrest? Or just that
> they called and asked for an investigation? We need some
> clarity on this claim.

Doc. no. 237. After showing the jury's question to the parties, the court explained its

understanding that the jury was asking whether Ortolano needed to demonstrate

that the acts taken by Attorneys Bolton and Leonard alleged to have caused her

arrest were themselves illegal, or whether Ortolano simply needed to prove that

Bolton and Leonard engaged in conduct that led to the arrest. See doc. no. 249 at 7.

The court's answer, which it refined based on input from the parties, informed the

jury that, to satisfy factual causation, Ortolano was "not required to prove that the

---

[17] Causation was the second element listed in the court's jury instructions. See
doc. no. 232 at 9-10

defendant's actions—that she alleges to have caused her arrest—were themselves illegal." Doc. no. 239. After receiving this response, the jury had no further questions, and shortly thereafter returned a verdict.

Far from demonstrating that the jury was confused about the concept of but-for causation, the jury's question shows only that jurors sought clarification regarding whether Ortolano needed to show that the defendant's "approach towards getting an arrest" was itself unlawful. Doc. no. 237. What is more, at a conference with the parties to discuss the jury's question, Ortolano requested that the court respond to the jury's question with her preferred language, and the court responded that the court's causation instruction already "essentially included" the information conveyed by Ortolano's preferred language, though not "in those exact words." Doc. no. 249 at 6. Ortolano indicated that she understood and agreed with the court's position.

Finally, the court is not persuaded by Ortolano's argument that she was prejudiced by the use of a general verdict form instead of her proposed special verdict form. "It is a fundamental proposition that a party is not entitled to the use of a special verdict under Federal Rule 49(a) as a matter of right." 9B Wright & Miller's Federal Practice & Procedure § 2505 (3d ed.) [hereinafter "Wright and Miller"]. A general verdict form is adequate so long as, when read in conjunction with the court's instructions, the verdict form allows the jury to resolve "all factual issues essential to judgment." Santos v. Posadas de P.R. Assocs., Inc., 452 F.3d 59, 65 (1st Cir. 2006) (quoting Sheek v. Asia Badger, Inc., 235 F.3d 687, 699 (1st Cir.

21

**EXHIBIT 1**

2000)). A district court's discretion to use or forego a special verdict form is so broad that "there appears never to have been a reversal on this ground." Wright & Miller, supra § 2505.

Ortolano's proposed special verdict form was ten pages long. See doc. no. 231-1. It would have required the jury to consider the evidence as to each defendant simultaneously, as opposed to permitting the jury to fully resolve whether Ortolano proved her claim against one defendant before then evaluating whether she proved her claim against the other. See doc. no. 232 at 8 (jury instructions) (instructing jury that "it is important to remember that the claims against each defendant are separate," that a verdict for or against one defendant does not by itself mean the same verdict should be reached as to the other, and that "[t]he parties are entitled to fair, separate, and individual consideration of the evidence"). Ortolano's proposed verdict form also would have required the jury to determine the specific amount of compensatory damages that each defendant was liable for, as opposed to simply determining the total amount of damages needed to compensate Ortolano for her harm. However, "[f]ederal common law principles of tort and damages govern recovery under section 1983," and "[i]t is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury." Watts v. Laurent, 774 F.2d 168, 179 (7th Cir. 1985); see also, e.g., Chao v. Ballista, C.A. No. 07cv10934-NG, 2011 WL 13244758, at *1 (D. Mass. May 5, 2011) (explaining that § 1983 "creates a 'species of tort liability,'" and that, where the plaintiff's injury "is a single

22

**EXHIBIT 1**

and indivisible result of torts committed by multiple tortfeasors, those tortfeasors are jointly and severally liable . . . even when they do not act in concert" (quoting Carey v. Piphus, 435 U.S. 247, 253 (1978))). Because Ortolano's special verdict form would have created a risk of jury confusion, was inconsistent with the court's instructions, and inaccurately applied the law of damages, Ortolano was not prejudiced by the court's failure to use her proposed verdict form.

III.     Excluding Evidence of a July 2022 Interaction Between Ortolano and Attorney Bolton Did Not Unfairly Prejudice Ortolano's Case

Prior to trial, Attorneys Bolton and Leonard moved to exclude evidence of a July 2022 encounter between Ortolano and Attorney Bolton at City Hall. In competing affidavits submitted at summary judgment, Attorney Bolton and Ortolano sharply disputed the circumstances of this encounter. See doc. nos. 71-2, 75-2.

According to Attorney Bolton, he was attempting to leave the Legal Department on July 22, 2022, when he encountered Ortolano in a hallway. Attorney Bolton claimed that Ortolano was preventing him from leaving and he directed her to move out of the way, but she refused. Ortolano then called the police, claiming that Attorney Bolton was assaulting her.

According to Ortolano, she was in the hallway outside the Legal Department on July 22, 2022, speaking with a legal assistant on the phone. She claimed that Attorney Bolton entered the hallway from the Legal Department and immediately began yelling that she could not be in the hallway, that she was not allowed to call anyone in the Legal Department, and that he could have her arrested. Because she

23

**EXHIBIT 1**

feared that Attorney Bolton would call the police, Ortolano called the police first to relay her account of what happened.

The parties did not dispute, however, that the police made no arrests regarding this incident. Moreover, this July 2022 event occurred approximately a year-and-a-half after the January 2021 incident and the ensuing criminal investigation and arrest—which was the only allegedly retaliatory action before the jury. Prior to trial, Attorneys Bolton and Leonard moved in limine to exclude evidence of the July 2022 encounter. The court granted that motion, finding that the encounter had limited relevance to Attorney Bolton's intent regarding the January 2021 incident, as it occurred more than a year later. See doc. nos. 166 at 2 (memorialization of oral ruling), 204 at 37-38 (transcript of oral ruling). Moreover, the court found that the probative value of the evidence was substantially outweighed by the dangers of jury confusion, creating a trial within a trial, and unfair prejudice. See doc. nos. 166 at 2, 204 at 37-38; see also Fed. R. Evid. 403.

Ortolano now moves for a new trial on the basis that the exclusion of this evidence prejudiced her case. Ortolano's arguments merely reiterate contentions that this court has repeatedly rejected. See doc. no. 196 at 3-5, 7-8 (recounting Ortolano's three motions to reconsider the ruling excluding evidence of the July 2022 encounter). Whether Attorney Bolton bore animus toward Ortolano in July of 2022 has limited relevance to whether he bore animus toward her in January and February of 2021. Moreover, given the inflammatory nature of the July 2022 encounter and the parties' starkly contrasting accounts of what transpired, allowing

EXHIBIT 1

evidence of the July 2022 encounter would have created a trial-within-a-trial as both sides marshaled evidence to persuade the jury that their version was correct. The amount of time the parties would have devoted to the July 2022 encounter would have distracted the jury from the task in front of them: determining whether Attorney Bolton subjected Ortolano to a retaliatory arrest more than a year earlier. The time spent discussing the July 2022 incident would also have introduced a significant likelihood of jury confusion, as jurors could have been confused as to whether they were supposed to evaluate if Attorney Bolton retaliated against Ortolano in 2021, 2022, or both. In short, Ortolano provides no basis to disturb the court's conclusion that the limited probative value of the July 2022 encounter was substantially outweighed by the dangers of jury confusion, creating a trial within a trial, and unfair prejudice. See Fed. R. Evid. 403.

IV.   The Admission of Evidence that Ortolano Was Not Emotionally Distressed Following Her Arrest Was Proper

Prior to trial, Ortolano moved to exclude evidence that, at a meeting of the Board of Assessors in August 2021, she stated in public testimony that Attorney Leonard's behavior during the January 2021 incident was the "cuntiest" Ortolano had ever seen. Def. Ex. GG at 3. The court denied Ortolano's motion, finding the evidence relevant to rebut Ortolano's assertion that the arrest caused her emotional distress damages. Ortolano now moves for a new trial on the basis that the admission of this evidence was unfairly prejudicial.

The court disagrees. Ortolano testified at trial that the arrest distressed her so much that she lost sleep, gained weight, and even developed "respiratory and

**EXHIBIT 1**

stomach problems." Doc. no. 252 at 59. She also testified that the arrest caused her to fear for her safety to the point that she "didn't walk [her] dog at night" and "generally avoided" City Hall. Id. at 60-61. Ortolano's August 2021 public testimony—which was offered within approximately a month of her guilty plea— was highly relevant to refute Ortolano's claims of emotional distress and that she feared additional retaliation.[18]

## CONCLUSION

For all of these reasons, Ortolano's motions for a new trial (doc. nos. 244 & 245) are denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

April 24, 2026

cc:    Counsel of Record

---

[18] While the court would have entertained a limiting instruction regarding this evidence, Ortolano did not request one.

26